UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CAROLINE SUNDEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 20 C 4945 |
| v. | ) |
| | ) Judge Sara L. Ellis |
| LOUIS DeJOY, Postmaster General for the | ) |
| United States Postal Service, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Caroline Sunden, who previously worked for the United States Postal Service ("Postal Service") as a probationary employee, filed this lawsuit against Louis DeJoy, the Postmaster General, alleging that the Postal Service discriminated against her on the basis of her sex when it terminated her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* The Postal Service has moved for summary judgment on Sunden's claim. Because no reasonable juror could conclude that Sunden's sex caused the Postal Service to terminate her employment, Sunden's discrimination claim cannot survive summary judgment.

## BACKGROUND[1]

Sunden worked for the Postal Service as a letter carrier at the Roger P. McAuliffe station from September 1, 2018 until January 15, 2019, when she resigned due to "personal issues." Doc. 37 ¶ 14. Several months later, the Postal Service hired Sunden to work as a tractor trailer operator at its International Service Center. She began working as a tractor trailer operator on March 16, 2019, subject to a ninety-day probationary period. Linda Hall, a supervisor of transportation for the Postal Service, oversaw Sunden's work. Hall supervised fifteen to

---

[1] The Court derives the facts in this section from the Joint Statement of Undisputed Material Facts. The Court takes all facts in the light most favorable to Sunden, the non-movant.

eighteen drivers at the time, with Sunden as the only female driver under her supervision. Brenda Evans, the manager of the transportation department, supervised Hall.

The probationary period "represents the final step in determining an employee's suitability, since only an actual trial on the job can be conclusive." *Id.* ¶ 7. The Postal Service conducts thirty-, sixty-, and ninety-day performance reviews for probationary employees. The Postal Service can initiate a separation of employment for a probationary employee's failure to meet expectations and may do so "at any time in the probationary period when it becomes apparent that the employee lacks capacity for efficient service." *Id.* ¶ 9.

### A. Attendance Issues

The Postal Service requires its employees to maintain regular attendance. An employee's failure to do so could result in disciplinary action, including removal. For illness-related absences, the Postal Service requires medical documentation that "provide[s] an explanation of the nature of the employee's illness or injury sufficient to indicate to management that the employee was incapacitated or unable to perform his or her assigned duties for the period of absence." *Id.* ¶ 41. Postal Service policy further explains that medical notes simply stating that an employee is under a doctor's care or received treatment do not suffice to prove "incapacitation to perform duties." *Id.* ¶ 42.

Sunden did not report for work on March 27, 28, and 29, 2019. But she did contact Hall, reporting that she was "very sick" and would provide a doctor's note when she returned. *Id.* ¶ 44. According to Sunden, Hall told Sunden that the absences were "not good" because Sunden was in the probationary period, but nonetheless, Hall thanked Sunden for notifying her of Sunden's absence. *Id.* Sunden testified that she did not want to miss work but had been sick for

several weeks and could not avoid going to the doctor any longer. When she returned to work on March 30, Sunden provided Hall with a doctor's note, which stated:

> Caroline Sunden was evaluated for illness or injury on 3/27/2019.
> This letter certifies that this patient has been under our care and
> that his or her absence is medically advised as indicated below.
> Patient is able to return to work/school: Other: 3/30/2019.
> Recommended restrictions for this patient to observe and duration
> of restrictions: None.

*Id.* ¶ 47. Hall testified that she did not understand this note to sufficiently convey that Sunden could not work before March 30, claiming that someone could be under a doctor's care but still able to work. Thus, under the Postal Service's policy, Hall deemed the note unacceptable documentation of a medical absence. Hall also testified that she perceived Sunden's attitude about the absences as "nonchalant." *Id.* ¶ 49. Sunden, however, testified that she took the matter seriously and told Hall she understood she should not miss days while on probation.

Nonetheless, about a week and a half later, on April 9, Sunden arrived to work almost three and a half hours late. Sunden reported to Hall that she had misread the schedule. Hall testified that she would not terminate someone for misreading a schedule once, but that if it happened several times during the probationary period, it could pose a problem.

In light of Sunden's attendance issues, Hall gave her an unacceptable rating in the dependability category on her thirty-day evaluation. Sunden received satisfactory ratings in all other categories. Sunden testified that Hall told her that Hall had to mark her down as unacceptable because of the unexcused absences, but that these absences would not actually count against her in her probationary period because the absences were unavoidable.

**B.     Safety Issues**

On April 23, 2019, John Smith, a Postal Service technician, reported to Hall that, on April 18, Sunden drove a tractor trailer even though he told her not to due to a faulty brake light

3

and rear door cable. He further explained to Hall that the brake light issue probably resulted from a shortage. Hall subsequently asked Smith to write up a statement, which ultimately read:

> On April 18 2019 T.T.O. Sunden asked me to repair a brake light on the trailer she was operating. I check[ed] the function of the light and found it needed further repair. I also noticed a broke rear door cable and advised T.T.O. Sunden not to use the trailer due to the saf[e]ty issues. She told me she was going to use the trailer with the saf[e]ty issues.

*Id.* ¶ 20 (alterations in original).

Sunden, however, testified that while Smith told her that the door was broken, he did not advise her not to use the trailer. She testified that she tested the door several times by lifting it up and down before leaving for the day. She did not consider the door to pose a safety issue because the door locked when it was down and stayed up when she lifted it. She also testified that she could perform all of her duties that day without issue, even with the broken door.

Hall admitted that drivers had ultimate responsibility for determining the safety of their vehicles for use and acknowledged that no evidence exists that Sunden did not perform an inspection of the tractor trailer before driving it. Nonetheless, Hall perceived the broken rear door cable to pose a safety issue that could have injured Sunden or others. Hall testified that drivers should address safety issues immediately, and she would have found any driver who took a trailer with a faulty brake light and broken rear door cable guilty of an unsafe act. Hall acknowledged, however, that a new probationary driver has a learning curve in determining the ins and outs of the job, including when to write up a vehicle for repair. Evans also believed that, by taking the trailer out despite knowing of the issue with the rear door, Sunden put herself and

4

the public in danger. According to Evans, Sunden's decision to do so violated the Postal Service's policy to take vehicles with safety issues out of service.[2]

Hall conducted a pre-disciplinary interview with Sunden on May 20 to address Smith's report of the safety issue. Sunden acknowledged asking Smith to repair the brake lights on her trailer on April 18 and that, after he fixed them, she checked and saw that the light worked. Sunden also stated that she took the trailer out because she thought it was safe to drive. Hall's notes from the meeting reflect the following exchange:

> Question: The mechanic also stated to you that the rear cable door was broken and advised you not to use the trailer due to safety issues.
>
> Answer: YES,
>
> Question: Did you take the trailer, if so why?
>
> Answer: I think that was safe to drive.

*Id.* ¶ 26. Sunden testified, however, that she actually responded "no" to the first question and that, when she saw Hall wrote down "yes" instead, Sunden pointed this out to Hall. According to Sunden, Hall "dismissed" Sunden's correction. *Id.* ¶ 27. During the interview, Hall also showed Sunden Smith's statement, after which Sunden authored the following statement:

> I TTO Sunden checked the trailer again before I left and saw the light on. I believe the trailer was safe to drive and workable.

*Id.* ¶ 28.

---

[2] Hall indicated in her EEO affidavit that by the time she learned of the safety issue, she could not find the trailer and so did not take it out of service. At her deposition, she testified that she did not take the trailer out of service because she had a lot going on at the time and that, while she did not know if the trailer had ever been repaired, she believed that drivers would not take the trailer out again until it had been repaired. The Postal Service did not provide the trailer number of the trailer in question, any repairs done to the trailer, or any other drivers who used the trailer after Sunden in response to Sunden's requests for this information during discovery.

### C. Other Concerns

Hall testified to several other instances that suggested to her that Sunden was not a good fit as a driver. First, on one occasion, Hall recalled sending a driver to collect Sunden after Sunden reported that her vehicle stopped running on her route. But when the driver arrived, the vehicle had started running again. Sunden then ignored Hall's instructions to write a maintenance ticket for the vehicle upon her return. With respect to this incident, Sunden testified that she called in the vehicle because it was in the middle of the street blocking traffic. She claimed that the other driver also had problems with the vehicle, which cut off on him as well, and that eventually a tow truck had to come and pick up the truck. Sunden explained that by the time the truck was brought in, Hall had left for the day and another supervisor handled the issue. Sunden represented that she filled out the correct paperwork and the truck remained in the lot for repair the following day.

Another issue, according to Hall, occurred when Sunden could not release the brakes on her tractor trailer, leading Hall to again send another driver to check on her. The driver reported to Hall that there was not a problem, Sunden just could not release the brake. Sunden, however, disputes that this incident occurred, contending that she knows how to release parking and emergency brakes and that Hall never raised the issue with her.

Although Hall acknowledged that the two incidents could be considered learning experiences, she testified that Sunden "use[d] her own opinion" to decide how to address the situations instead of following instructions. *Id.* ¶ 57 (alteration in original). Hall also felt that Sunden should have known how to handle the situations instead of requiring additional driver help.

Hall also testified that she learned from Nona Austin, who filled in for Hall on her days off, that Sunden had not followed Austin's instructions on more than one occasion. Hall claimed that she then counseled Sunden that Sunden had to do as Austin said. Sunden, however, denies that she did not follow Austin's instructions or that Hall ever counseled her on the issue. After Austin reported that Sunden continued to ignore her instructions, Hall asked Austin to write a statement. In her statement, Austin reported that while acting as Sunden's supervisor on April 13, 2019, Austin told Sunden to follow a driver to a different facility so as to bring back an empty trailer. According to Austin, Sunden left without the other driver but then called Austin an hour and a half later indicating she did not know how to get to the facility. When she returned, Austin stated that Sunden reported problems with the brakes on her trailer, Austin gave Sunden a form to write up the problem and also asked her to take a load to another facility, and Sunden instead went to lunch without doing so. Sunden, however, states that the driver Austin told her to follow was not at work that day, meaning she could not follow him to the other facility. She admits calling Austin for help because she had missed a turn and had never been to the facility before. Sunden also maintains that when she got to the facility, there was no trailer for her to pick up. Sunden cannot recall whether she reported having brake issues on her trailer, denies that Austin gave her a form to write up the problem or another assignment for the day, but acknowledges going to lunch after she returned from the first facility.

Evans also believed that Sunden had driven her trailer with the brakes locked, which caused the trailer to drag, instead of alerting her supervisor of the issue, and that Sunden had ignored an assignment from Austin to do a mail run opting to go to lunch instead. Evans described Sunden's actions as "egregious," concluding that "[w]e are all blessed nothing happened." *Id.* ¶ 82. Sunden denies ever driving a trailer with the brakes locked or while a

trailer was dragging, contending no one brought any such allegation to her attention. She also again denies failing to follow through with any assignment Austin gave her.

### D. Sunden's Separation

On Sunden's sixty-day evaluation, conducted on May 20, 2019, Hall rated Sunden as unacceptable in the work methods category based on "Unacceptable Conduct / Unsafe Act." *Id.* ¶ 68. Sunden received satisfactory ratings in all other categories.

A little over a week after that evaluation, on May 29, Hall prepared, and Evans signed as the concurring authority, a notice of separation for Sunden. That notice informed Sunden of her separation from the Postal Service as of May 30, which fell within her probationary period. The separation notice charged Sunden with both "Unacceptable Conduct / Unsafe Act" and "Failure to Maintain Regular Attendance." *Id.* ¶ 72. With respect to the unacceptable conduct, the notice stated that Sunden ignored the mechanic's warning not to use the trailer due to the broken cable on the back door of the trailer and the brake lights being out, deeming Sunden's actions "unacceptable" because she was "given a clear instruction . . . to follow but failed to do so" and her "lack of concern to safety issues placed a burden to the Postal Service." *Id.* ¶ 75. As for attendance issues, the notice highlighted two days of leave without pay on March 27 and 28, one day of leave without pay/sick time on March 29, and a part-day leave without pay on April 9. According to the notice, these absences violated the rules and regulations of the Postal Service's Employee and Labor Relations Manual because Sunden did not maintain her assigned schedule.

### F. Alleged Discrimination by Hall

Sunden believes her sex factored into her separation because (1) Hall "does not keep women on her shift or in the department;" (2) an unidentified coworker told Sunden that Hall "does not like female drivers;" (3) unidentified coworkers warned Sunden "on a regular basis" to

8

stay away from Hall because she had fired other female employees; (4) Sunden's union representative told her that Hall "doesn't like women;" and (5) Hall used a "sarcastic or condescending" tone when speaking to Sunden, different from how she spoke to male drivers. *Id.* ¶ 83. Sunden also testified that she did not think Hall trusted female drivers.

Between 2016 and 2021, Hall supervised two female and two male probationary employees. Hall testified that over this time period, she had only recommended Sunden and one other driver not on probation for termination. The other female under Hall's supervision while on probation, Estella Neely, received a notice of separation in August 2019 after crashing her trailer into a parked truck, causing damage to both the parked truck and the trailer. Although Hall supervised Neely at the time, Valencia Jones, another supervisor, signed Neely's notice of separation because Hall was away from work at the time. Jones also signed a notice of separation for Minika Edwards, another probationary driver, in August 2019, after Edwards drove through a CTA viaduct with a height lower than that of the trailer, which caused property damage and tore off the roof of the trailer.

Sunden identified Robert Fair, a male coworker also on his probationary period, as a potential comparator. Fair misread his schedule on May 11 and 12, 2019 and so missed two days of work. Hall did not approve Fair's absences and marked them as unacceptable. He received an unacceptable rating from Hall in the dependability category on his thirty-day evaluation. Fair was not disciplined or terminated for these absences, however. On his sixty-day evaluation, Fair received two outstanding ratings and no unacceptable ratings. Hall and Evans also testified that Fair did not have any safety issues or other unscheduled absences during his probationary period.

9

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

**ANALYSIS**

Title VII makes it an unlawful employment practice "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Sunden claims that the Postal Service terminated her because of her sex. The Postal Service argues, however, that no reasonable juror could find that the Postal Service discriminated against her, with the evidence in the record instead supporting a non-discriminatory reason for her termination, specifically, that she engaged in unsafe conduct and incurred too many unexcused absences.

Courts previously spoke of proceeding under an indirect or direct method to establish discrimination, but the Seventh Circuit has instructed that instead of using such tests, the Court should consider the evidence "as a whole" to determine whether it "would permit a reasonable factfinder to conclude that the plaintiff's . . . sex . . . caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). This does not mean that the Court cannot consider the traditional burden-shifting test laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), under which the Postal Service frames its argument. *See Ortiz*, 834 F.3d at 766 (noting that its decision does not overrule *McDonnell Douglas*). But because Sunden clarifies in her response that she does not seek to use *McDonnell Douglas*' burden-shifting test to prove her claim, the Court only considers the evidence as a whole in addressing whether a reasonable factfinder could find that Sunden's sex caused her to suffer an adverse employment action. *See id.* at 765–66.

Sunden may demonstrate causation through evidence of, for example, comments or animus toward her protected group, suspicious timing, more favorable treatment of similarly situated employees, or pretextual reasons given for her termination. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020) ("We have identified three broad types of circumstantial evidence that

11

will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment.").

### A. Pretext

In opposing the Postal Service's request for summary judgment, Sunden mainly focuses on whether the Postal Service's reasons for terminating her were pretextual. "Pretext requires more than showing that the decision was mistaken, ill considered or foolish, and so long as the employer honestly believes those reasons, pretext has not been shown." *Formella v. Brennan*, 817 F.3d 503, 513 (7th Cir. 2016) (citation omitted). Sunden can "demonstrate pretext directly by showing that 'a discriminatory reason more likely motivated' [her] termination, or indirectly by showing that [the Postal Service's] explanations are 'unworthy of credence.'" *Senske v. Sybase*, 588 F.3d 501, 507 (7th Cir. 2009) (citation omitted). In determining whether an employer's explanation is honest, courts look to the reasonableness, not the accuracy, of the explanation. *Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 492 (7th Cir. 2008); *see also Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered.").

Here, the Postal Service represents that it terminated Sunden because she engaged in unsafe conduct by driving a trailer after being advised of a broken rear door cable and incurred unexcused absences during her probationary period. Sunden argues that the facts underlying the alleged safety issue and her unscheduled absences are disputed, calling into question the reasonableness of the Postal Service's explanation for her termination. The Court, however, must focus on what the Postal Service believed, not whether its beliefs were accurate. *See*

12

*Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006) ("Suppose the complaint of sexual harassment in this case had been a pure fabrication, with 'no basis in fact' whatsoever—yet it was believed by the employer and it was that belief and nothing else that caused him to fire the plaintiff. There would be nothing pretextual about his action. A pretext, to repeat, is a deliberate falsehood."); *Walker v. Glickman*, 241 F.3d 884, 890 (7th Cir. 2001) ("[T]he court's role is not to determine whether [the employer's] decision was right, but whether [the employee] presented sufficient evidence that [the employer's] reason was a lie for the action it took."). In other words, "[t]he proper inquiry mandates looking at [Sunden's] job performance through the eyes of her supervisors at the time of her . . . termination." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008).

Initially, Sunden disputes that the broken rear door cable posed a safety issue, contending that Smith only advised her that the rear door was broken and that she determined that the trailer was safe to drive. In other words, Sunden claims that her judgment as to the safety of driving the trailer should control or at least call into question Hall and Evans' evaluation of the situation. But Sunden's belief that no safety issue existed does not create a question of fact, particularly where she does not dispute that Smith told her about the problem. *See Lauth v. Covance, Inc.*, 863 F.3d 708, 715–16 (7th Cir. 2017) ("Lauth's belief that he was performing his job adequately is not relevant to the question of whether Covance believed it had a legitimate, non-discriminatory basis to terminate him."). Similarly, the fact that Sunden disagrees with Hall and Evans' evaluations of her skills as a driver or the bases Hall and Evans set forth for their opinions does not create an issue of fact. *See Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001) (in "discussing the nature of the pretext inquiry, [the court has] stated that it is not enough for a plaintiff to show that his employer's explanation was based on an inaccurate

13

assessment of its employee's performance"); *Mirocha v. Palos Cmty. Hosp.*, 240 F. Supp. 3d 822, 839 (N.D. Ill. 2017) (the plaintiff could not create an issue of fact by claiming he was performing adequately or by challenging his supervisors' assessment of his performance).

Sunden also argues that Hall's notes from the predisciplinary interview about the safety issue incorrectly recorded Sunden's responses to Hall's questions, suggesting that Hall knowingly and intentionally recorded false statements to justify Sunden's termination. But even accepting Sunden's representation that Smith did not advise her not to use the trailer and that Hall disregarded Sunden's statement on that fact, the record does not suggest that Hall did not believe that Sunden had driven a trailer with a broken door or that Hall did not view that decision to pose a safety issue. Instead, the record suggests that Hall sincerely held these beliefs. *See, e.g.*, Doc. 37 ¶ 20 (Smith reported to Hall that he "advised T.T.O. Sunden not to use the trailer due to the saf[e]ty issues"); *id.* ¶ 22 (Hall testified, "She can hurt herself or anybody can hurt theirself trying to pull it up because the door is damaged. . . . It's a safety issue."); *id.* ¶ 68 (Hall rated Sunden as unacceptable in the work methods category because of the issue). Thus, Hall's notes do not call into question the honesty of the Postal Service's explanation for Sunden's termination. *See Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 462 (7th Cir. 2021) ("An employer's explanation is not pretext if 'the employer honestly believed in the nondiscriminatory reasons it offered.'"); *Seymour-Reed v. Forest Pres. Dist. of DuPage Cnty.*, 752 F. App'x 331, 335 (7th Cir. 2018) (upholding grant of summary judgment for employer where the record failed "to suggest that the [employer] used performance reasons to cover its discrimination" and instead "show[ed] only that [the employee] disagreed with how the [employer] viewed his interactions with his supervisor and took the word of [another employee] over his own").

Sunden further argues that the broken rear door did not pose a true danger because, once they learned of Smith's report, Hall and Evans did not quickly act to take the trailer out of service. But again, while Sunden questions Hall and Evans' assessment of the severity of the safety issue, the pretext inquiry does not consider the accuracy of the employer's stated reasoning. *Stewart*, 207 F.3d at 378; *see Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 927 (7th Cir. 2019) ("[A]n inquiry into pretext requires that we evaluate the honesty of the employer's explanation, rather than its validity or reasonableness." (citation omitted)).

Finally, Sunden contends that basing her termination on her unscheduled absences was pretextual because Sunden provided Hall with a doctor's note excusing Sunden's three-day absence in March and Hall testified that she would not terminate an employee for misreading the schedule once, which is all that Sunden did. Specifically, Sunden argues that Hall inexplicably deemed Sunden's doctor's note unacceptable under the Postal Service's policy despite the fact that it described her absence as "medically advised" and stated that she could return to work on March 30. Doc. 37 ¶ 47. However, the Postal Service's policy for illness-related absences requires medical documentation that "provide[s] an explanation of the nature of the employee's illness or injury sufficient to indicate to management that the employee was incapacitated or unable to perform his or her assigned duties for the period of absence." *Id.* ¶ 41. The doctor's note Sunden provided to Hall does not provide any explanation of the nature of Sunden's illness or injury and therefore, Hall's determination that the note did not excuse Sunden's absences is not evidence of pretext. Sunden also points out that Hall testified that she perceived Sunden's attitude about the absences as "nonchalant," *id.* ¶ 49, even though Sunden told Hall that Sunden understood the seriousness of the matter. But again, "the fact that [Sunden] disagrees with her

15

supervisor's assessment does not establish pretext." *Abebe v. Health & Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 607 (7th Cir. 2022).

Even taking Sunden's view of the events underlying Hall and Evans' evaluations as true, Sunden has not presented evidence that suggests that Hall and Evans did not believe the reasons they set forth for Sunden's separation. Thus, she has not sufficiently called into question whether those reasons served as pretext for discrimination. *See Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1310 (7th Cir. 1997) ("The fact that the employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proffered explanation is pretextual. Thus, to prevent summary judgment, Essex must present evidence that UPS is insincere when it claims to have discharged Essex for insubordination." (citations omitted)). Ultimately, while Sunden may believe that her actions did not warrant termination, the Court does not sit as a "'super personnel department' that second-guesses employers' business judgments." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) (citation omitted); *see Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 464 (7th Cir. 2014) ("This court has repeatedly stated that it is not a super-personnel department that second-guesses employer policies that are facially legitimate. . . . A court cannot interfere because an employer's decision is unwise or unfair.").

### B. Differential Treatment

Sunden also argues that the Postal Service treated her differently than her male coworkers. "Similarly situated employees 'must be directly comparable to the plaintiff in all material respects,' but need not be identical in every conceivable way." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (citation omitted). Typically, a plaintiff must at least show that the comparators "(1) dealt with the same supervisor, (2) were subject to the same standards,

16

and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 847. Here, Sunden points to Fair, whom the Postal Service did not fire after two unexcused absences.

Fair does not serve as a proper comparator. Fair did not create any safety concerns during his probationary period, meaning he did not engage in similar conduct to Sunden that could have warranted termination. *See id.* at 850 ("In a disparate discipline case, the similarly-situated inquiry often hinges on whether co-workers 'engaged in comparable rule or policy violations' and received more lenient discipline." (citation omitted)); *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) ("[I]n order to show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a 'comparable set of failings.'" (citation omitted)); *cf. Filar v. Bd. of Educ. of the City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008) ("All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination."). Further, Hall gave both Fair and Sunden the same unacceptable rating in the dependability category on their thirty-day evaluations, suggesting that the Postal Service actually treated them in the same manner based on the same conduct, undermining any inference of discrimination.

Aside from pointing to Fair as a comparator, Sunden appears to argue that Hall more generally harbored a discriminatory animus toward women. Sunden points out that she was the only female driver Hall supervised at the time and that the Postal Service terminated both of the female probationary employees that Hall supervised between 2016 and 2021 during their probationary periods. But these facts do not create a dispute of fact here, given that the Court does not have sufficient details to determine all the circumstances of the drivers Hall supervised.

17

And no reasonable juror could infer from the mere fact that Hall supervised more males than females that she harbored animus toward women; nothing in the record suggests that Hall had any influence over the number of females and males she supervised or that she deliberately chose not to work with females. *See Andreola v. Wisconsin*, 211 F. App'x 495, 498 (7th Cir. 2006) ("Although we take the facts in the light most favorable to [Sunden], [her] own conclusory allegations unsupported by specific facts will not suffice to rebut evidence supporting a summary judgment motion.").

Sunden also cites to various comments she heard about Hall's dislike of female drivers from coworkers, but such comments from unidentified sources are inadmissible hearsay. Fed. R. Evid. 801; *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011) ("A party may not rely on inadmissible hearsay to avoid summary judgment."); *see also Rufus v. City of Chicago*, No. 17-cv-4192, 2019 WL 1572545, at *6 (N.D. Ill. Apr. 11, 2019) ("Absent any admissible evidence in the record (such as statements based upon personal observation or first-hand experience), Plaintiff cannot utilize second-hand accounts from other employees to defeat summary judgment."). And while Sunden testified that Hall generally spoke to her in a condescending or sarcastic tone that Hall did not use with male employees, this also does not create a question of fact as to whether Sunden's gender caused her termination. *See McNeal v. Presence Chicago Hosps. Network*, 804 F. App'x 407, 409 (7th Cir. 2020) ("[I]solated incidents of unfriendliness or 'other subtle indicia of distaste' are generally not evidence of discriminatory animus." (citation omitted); *Brown-Marshall v. Dart*, No. 08 C 2534, 2009 WL 1904360, at *6 (N.D. Ill. July 1, 2009) ("Plaintiff supports her alternative explanation— discriminatory animus—only with her testimony that she perceived Kaufman to have mistreated African–American employees. But Plaintiff's broad-stroked, conclusory assessment of

Kaufman's behavior, absent details that would allow a jury to infer that he was motivated by race and sex, is insufficient.").

Because none of the evidence in the record creates a question of fact as to whether the Postal Service terminated Sunden because of her sex, she cannot prevail on her claim and the Court grants summary judgment for the Postal Service.

## CONCLUSION

For the foregoing reasons, the Court grants the Postal Service's motion for summary judgment [35] and enters judgment for the Postal Service on Sunden's complaint. Case terminated.

Dated: June 27, 2022

_____
SARA L. ELLIS
United States District Judge